IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**JAMES GALLANT**,

              Plaintiff,

      v.

**BENTON COUNTY**, a political subdivision
of the State of Oregon, and **JERRY
WILLIAMS**,

              Defendants.

_____

**Civ. No. 6:13-cv-00030-MC**

**OPINION AND ORDER**

**MCSHANE, Judge**:

      On January 12, 2011, plaintiff Dr. James Gallant (Gallant) crashed his vehicle while

driving to his office in Corvallis. Prior to the crash, Peter Ness (Ness), a third-party, observed

Gallant weave and swerve until he "shot across the road and into a field" on the opposite side of

the Highway. Decl. of Peter Ness 2, ECF No. 30. Officer Aaron Mollahan (Mollahan), defendant

Deputy Jerry Williams (Williams), and Reserve Deputy David Hamby (Hamby) arrived at the

scene between 7:35 a.m. and 7:45 a.m. All three officers observed Gallant exhibit behaviors

indicative of intoxication (e.g., impaired coordination, motor skills, and cognitive skills). As a

result, Deputy Williams administered field sobriety tests. During the subsequent field sobriety

tests, Gallant informed Deputy Williams that he had taken a controlled substance, Ambien.

Based on this information and the observations of the respective parties, Deputy Williams

arrested Gallant without warrant for Driving under the Influence of Intoxicants (DUII) and

Reckless Driving.

1 – OPINION AND ORDER

This Court is asked to consider whether Gallant's seizure was lawful under the Fourth Amendment.[1] Because defendant Deputy Williams had probable cause to arrest Gallant for DUII and Reckless Driving, this Court finds that Gallant's arrest was lawful under the Fourth Amendment. Thus, defendants' motion for summary judgment, ECF No. 22, is GRANTED.

## PROCEDURAL AND FACTUAL BACKGROUND

This action arises out of an alleged violative arrest and prosecution. On January 12, 2011, Ness, a third-party, observed a green Toyota pickup truck weave among lanes and then eventually crash sometime between 7:15 a.m. and 7:30 a.m. Decl. of Peter Ness 2, ECF No. 30. Ness, who at that time was traveling southbound on Highway 99, observed the truck cross the center line and enter the northbound lane about five times and also drive "over the fog line" about five times. *Id*. Ness noted that the truck's speed "varied from about 45 mph to about 65 mph." *Id*. The truck then went off the pavement to the right (the west side of Highway 99), around a sign, and traveled east across Highway 99 into an open field. *Id*. at 2. The truck continued, seeming to accelerate, until it "went sideways into the fence and tree, jumped over the ditch, landed in another field and spun around and hit another fence." *Id*. After coming to a stop, the driver of the truck, later identified as Gallant, unsuccessfully attempted to back up the vehicle multiple times. *Id*. at 2–3.

Ness, having witnessed the vehicle crash, contacted 911 and went to the scene to help. *Id*. at 1, 3. As he approached the vehicle, Ness observed that Gallant appeared disoriented and confused: "[Gallant] was trying to get out of the vehicle, and was holding on to the vehicle. [Gallant] stumbled and had to grab his vehicle for support." *Id*. at 3.

---

[1] In *Mapp v. Ohio*, 367 U.S. 643, 655, 660 (1961), the Supreme Court selectively incorporated the Fourth Amendment through the Fourteenth Amendment Due Process clause and applied it to the states.

2 – OPINION AND ORDER

At approximately 7:35 a.m., Officer Mollahan of the Adair Village Police Department arrived at the scene. Decl. of Aaron Mollahan 2, ECF No. 27. Officer Mollahan approached the vehicle and asked Gallant whether he was injured. *Id*. at 5. Gallant informed Officer Mollahan that he was not injured and briefly explained that he was a doctor, where he lived and where he was going. *Id*. While waiting for other officers and medics to arrive, Officer Mollahan observed Gallant step out of his vehicle, "lean against his vehicle for stability," "trip[,] and almost f[a]ll." *Id*. at 2. Officer Mollahan asked Gallant to remain in his seat until the medics arrived. *Id*. Gallant complied after Officer Mollahan asked a second time, but "appeared to be somewhat confused." *Id*.

At approximately 7:45 a.m., Deputy Williams and Reserve Deputy Hamby arrived at the scene. *Id*. at 5; Decl. of Jerry Williams 2, ECF No. 24. Initially, Deputy Williams investigated the crash scene while Deputy Hamby interviewed Ness and Gallant. Decl. of Jerry Williams 2, ECF No. 24. During his investigation, Deputy Williams observed tire tracks confirming Ness's observations, and vehicle damage. *Id*. at 2–3; *see also* Decl. of Jerry Williams 1–6, ECF No. 24-1 (photographs of vehicle); Decl. of James Gallant 4, ECF No. 42 (indicating repairs cost over $16,000).

Deputy Hamby, having been informed of Ness's observations, interviewed Gallant. During his interview, Gallant had "difficulty maintaining his balance and had to lean against his truck while talking." Decl. of David H. Hamby 2, ECF No. 28. Gallant informed Deputy Hamby that he "had a very late night and fell asleep and went off the road." *Id*. at 3. When asked about his difficulty maintaining balance, Gallant informed Deputy Hamby that he was on several medications, including: Synthroid; Diovan; Uloric; and Victosa. *Id*. Deputy Hamby then relayed this information to Deputy Williams. *Id*.

3 – OPINION AND ORDER

Deputy Williams, having finished his initial investigation and received information from Deputy Hamby, made contact with Gallant. Decl. of Jerry Williams 3–4, ECF No. 24. Deputy Williams initially observed that Gallant "had droopy eyelids, and a lethargic look on his face." *Id.* at 4. Gallant, in response to Deputy Williams's questions, informed him that he also took Benadryl, Ativan,[2] and Ambien the previous evening. *Id.* at 4–5; Decl. of Bottorff 4, ECF No. 25. Shortly afterward, Gallant consented to field sobriety tests. Decl. of Jerry Williams 4–5, ECF No. 24

Deputy Williams first administered the Horizontal Gaze Nystagmus (HGN) test. *Id.* at 4; Decl. of Jerry Williams 4, 24-2. Deputy Williams, in observing "4 out of 6 clues," noted that Gallant "lacked smooth pursuit in both eyes" and a hard time focusing on Deputy Williams's stimulus. Decl. of Jerry Williams 4, ECF No. 24. Second, Deputy Williams administered the Nine Step Walk and Turn (Walk and Turn) test. On the Walk and Turn test, Deputy Williams detected "6 out of 8 clues." *Id.* These "clues" included: Gallant stepped out of position; he stepped off the line three times; he improperly stopped; he took an improper number of steps; he turned using both feet; and he lifting his arms for balance. *Id.* at 4–5. Third, Deputy Williams administered the One Leg Stand test. On this test, Gallant exhibited "3 out of 4 clues." *Id.* at 5. These clues included: Gallant used his arms to balance and he swayed and hopped in a half circle. *Id.*

After concluding the field sobriety tests, Deputy Williams arrested Gallant for DUII, ORS § 813.010, and Reckless Driving, ORS § 811.140. *Id.* at 5–6. Deputy Williams took Gallant

---

[2] At oral argument, Gallant's attorney contended that Gallant did not take Ativan the previous evening. However, Gallant's declaration merely states that Gallant took Ambien and Benadryl the prior evening. Decl. of Gallant 3, ECF No. 42. There is no evidence on record that Gallant contests that he told either Deputy Williams or Detective Bottorff that he had taken Ativan the previous evening. However, for purposes of this analysis, this Court will assume that Gallant's use of Ativan is contested.

to the Benton County Jail. *Id.* at 6. After consulting with an attorney, Gallant consented to a breath test. Test results indicated Gallant's BAC was 0.00%. *Id.* Deputy Williams then contacted Detective Bottorff, a Drug Recognition Expert (DRE), to request a DRE evaluation. *Id.*

Detective Bottorff arrived at the jail and administered the DRE evaluation with Gallant's consent at approximately 10:37 a.m. Decl. of Toby Bottorff 3, ECF No. 25. Detective Bottorff noticed that Gallant's "face was flushed and red, his eyes were bloodshot and his eyelids were slightly droopy." *Id.* Pursuant to the DRE, Detective Bottorff administered the Romberg Balance evaluation (Romberg), the Walk and Turn test, the One Leg Stand test, the Modified Finger to Nose (Nose) test, the HGN test, and a urine test. *Id.* at 4–6. During the Romberg test, Detective Bottorff noticed Gallant had a one to two inch circular sway and slight eyelid tremors. *Id.* at 4. During the Walk and Turn test, Gallant lost his balance, he started before being instructed, he forgot to count his steps aloud, he stepped off the line slightly, he took an improper number of steps, he missed heel-to-toe, and he continued to attempt the test after it was finished. *Id.* at 4–5. During the One Leg Stand test, Gallant had a slight sway, he put his food down for balance, and he finished before the test was completed. *Id.* at 5. During the Nose test, Gallant missed his nose three out of six attempts. *Id.* at 6. During the HGN test, Gallant "had lack of smooth pursuit in both eyes" and had a distinct and sustained Nystagmus at maximum deviation in both eyes." *Id.* at 6. Gallant's urine sample, upon examination by the Oregon State Police Crime Laboratory, confirmed the presence of Ambien and Benadryl by letter dated May 26, 2011. *Id.* at 7, 15, 18. At the end of the DRE evaluation, Detective Bottorff concluded that probable cause existed to arrest Gallant for DUII and Reckless Driving. *Id.* at 6–7.

On June 1, 2011, Benton County District Attorney's Office (BCDA) charged Gallant with DUII and Reckless Driving. Decl. of Christian H. Stringer 4, ECF No. 26. BCDA

5 – OPINION AND ORDER

subsequently dismissed the DUII charge,[3] but prosecuted Gallant on the remaining Reckless Driving charge. *Id.* at 2; Pl.'s Am. Compl. 2, ECF No. 4. At trial, Gallant was acquitted of the Reckless Driving charge by jury verdict. Pl.'s Am. Compl. 3, ECF No. 4; Decl. of James Gallant 7, ECF No. 42.

## STANDARD OF REVIEW

This Court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).

## DISCUSSION

Plaintiff, in his complaint, contends that: (1) defendants unreasonably seized him in violation of the Fourth Amendment under 42 U.S.C. § 1983 and (2) defendant Benton County maliciously prosecuted him under Oregon law. Defendants move for summary judgment as to all claims.

---

[3] The prosecuting attorney, Christian Stringer, dismissed the DUII claim because he "did not feel [he] could prove beyond a reasonable doubt" that Ambien, and not Benadryl, caused Gallant's alleged impairment. Decl. of Christian H. Stringer 2, ECF No. 26.

## I. Plaintiff's Fourth Amendment Claim under 42 U.S.C. § 1983

Plaintiff, in his Fourth Amendment claim, alleges that: (1) Deputy Williams unreasonably seized him "absent a warrant or probable cause" and (2), under *Monell*, Deputy Williams's unlawful conduct reflected the "policies and practices of [defendant] Benton County." Pl.'s Am. Compl. 3, ECF No. 4. In response, defendants contend that probable cause existed to arrest plaintiff for DUII and Reckless Driving. This Court addresses each allegation in sequence.

## A. Plaintiff's Seizure

The Fourth Amendment protects persons against "unreasonable searches and seizures." U.S. CONST. amend. IV. "The reasonableness of a warrantless arrest is determined by the existence of probable cause." *Allen v. City of Portland*, 73 F.3d 232, 235 (9th Cir. 1995) (citation and internal quotation marks omitted). "Probable cause for a warrantless arrest arises when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe 'that the suspect has committed, is committing, or is about to commit an offense.'" *Barry v. Fowler*, 902 F.2d 770, 773 (9th Cir. 1990) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

Gallant was arrested without warrant on January 12, 2011, for DUII, ORS § 813.010, and for Reckless Driving, ORS § 811.140. Decl. of Jerry Williams 1–2, ECF No. 24-2. This Court first looks to those statutes.

ORS § 813.010, in relevant part, provides:

> (1) A person commits the offense of driving while under the influence of intoxicants if the person drives a vehicle while the person:
>
> > (a) Has 0.08 percent or more by weight of alcohol in the blood of the person as shown by chemical analysis of the breath or blood of the person made under ORS 813.100, 813.140 or 813.150;

> (b) Is under the influence of intoxicating liquor, a *controlled substance* or an inhalant; or
>
> (c) Is under the influence of any combination of intoxicating liquor, an inhalant and a controlled substance.

(emphasis added). "ORS 813.010 sets forth two essential elements. A person commits the crime of DUII when the person (1) 'drives a vehicle' (2) while 'under the influence' of an intoxicating substance." *State v. Newman*, 353 Or. 632, 637 (2013) (citations omitted). An "intoxicating" or "controlled substance" under ORS § 813.010 includes Ambien ("zolpidem"). *See State v. Stubbs*, 256 Or. App. 817, 828 (2013) ("Defendant's testimony about his Ambien use, and the other evidence concerning Ambien, was relevant to explain . . . the question of whether defendant drove while under the influence of 'controlled substances.'"); *see also* ORS § 475.005(6) (adopting Schedules I through V under the Federal Controlled Substances Act, 21 U.S.C. §§ 801–904); 21 C.F.R. § 1308.14(c)(53) (classifying "zolpidem" under Schedule IV).

Defendants, in reliance upon observations made by Ness, Officer Mollahan, Deputy Hamby, Deputy Williams, and statements by Gallant, contend that Deputy Williams had probable cause to arrest Gallant for DUII and Reckless Driving. *See* Defs.' Mem. in Supp. of Mot. Summ. J. 24–25, ECF No. 23. This Court agrees.

Ness, a third-party, observed Gallant swerve out of his lane multiple times, drive at inconsistent speeds, and crash into two fences and a tree. Decl. of Peter Ness 2–3, ECF No. 30. Upon arrival at the crash scene, Ness observed that Gallant appeared disoriented and confused. *Id*. at 3. Deputy Williams, having received this information, was entitled to rely upon it in formulating his probable cause assessment. *See, e.g.*, *United States v. Sparks*, 265 F.3d 825, 830 (9th Cir. 2001) ("[The witness's]

8 – OPINION AND ORDER

credibility was not seriously in dispute. This was not an unreliable criminal informant, but a complaining victim who had no apparent reason to lie."), *overruled on other grounds by United States v. Grisel*, 488 F.3d 844, 851 n.5 (9th Cir. 2007).

Ness's observations were further corroborated by observations of Officer Mollahan, Deputy Hamby, and Deputy Williams. Officer Mollahan noticed that Gallant had stability problems and appeared to be confused. Decl. of Aaron Mollahan 2, ECF No. 27. Deputy Hamby, in conducting his initial interview, also noticed that Gallant had difficulty maintaining his balance. Decl. of David H. Hamby 2–3, ECF No. 28. After Deputy Hamby commented on Gallant's balance difficulties, Gallant informed Deputy Hamby that he had taken multiple medications the prior evening and that he fell asleep while driving. *Id*.

Meanwhile, Deputy Williams investigated the crash scene. At the scene, Deputy Williams identified tire tracks leading to Gallant's vehicle, which confirmed Ness's observations. Decl. of Jerry Williams 2–3, ECF No. 24. After concluding this initial investigation, Deputy Williams received an update from Deputy Hamby and approached Gallant. *Id*. at 3–4. Deputy Williams noted that Gallant "had droopy eyelids[] and a lethargic look on his face" and had difficulty responding to questions. *Id*. at 4. Deputy Williams then sought and received Gallant's permission to administer field sobriety tests. *Id*.

Deputy Williams administered three tests including: HGN; Walk and Turn; and One Leg Stand. During the HGN test, Deputy Williams observed "4 out of 6 clues" and noted that Gallant lacked smooth pursuit in both eyes and had difficulty focusing on Williams's stimulus. *Id*. Deputy Williams asked Gallant whether he had taken any

9 – OPINION AND ORDER

prescription that would cause Nystagmus. *Id.* at 5. After contesting the reliability of HGN, Gallant informed Deputy Williams that he had taken Ambien the previous evening. *Id.* During the Walk and Turn test, Deputy Williams observed "6 out of 8 clues" including, but not limited to: Gallant failed to follow instructions; he stepped off the line three times; he improperly stopped; he took an improper number of steps; he turned using both feet; and he had difficulty maintaining balance. *Id.* at 4–5. During the One Leg Stand, Gallant exhibited "3 out of 4 clues" evidencing difficulties maintaining balance ("[Gallant] hopped in a half circle") and following instructions. *Id.* at 5.

Deputy Williams interpreted these observations through the lens of his training and experience to find probable cause. At that time, Deputy Williams had worked as an officer for approximately seven years, taken over 760 hours of special training, including: "400 hours of DPSST Basic Police Training, 320 hours of Reserve Deputy Sheriff Academy training, and 44 hours of specialized training focusing on drugs and Intoxilyzer training." *Id.* at 2; *see also United States v. Arrellano-Rios*, 799 F.2d 520, 523 (9th Cir. 1986) ("The experience of a trained law enforcement agent is entitled to consideration in determining whether there was probable cause.").

Collectively, these circumstances are sufficient to warrant *a prudent person*[4] to believe that Gallant drove while under the influence of Ambien, a controlled substance. Gallant admitted

---

[4] Gallant argues at length that the facts elucidated were "inadmissible 'expert' opinions from non-experts." Pl.'s Mem. in Opp'n to Summ. J. 8, ECF No. 39. However, the probable cause analysis is determined by the *prudent person* standard and does not require the degree of expertise articulated by Gallant under these circumstances. *See, e.g., Brinegar v. United States*, 338 U.S. 160, 175 (1949) ("In dealing with probable cause . . . we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."). To the extent that Gallant argues that Deputy Williams's observations were "inadmissible," that has no bearing on this Court's *probable cause* analysis under these

to having driven and taken Ambien the prior evening. Decl. of Jerry Williams 5, ECF No. 24.

Although Gallant contests whether he remained "under the influence" of Ambien at the time of

the accident, Deputy Williams clearly had grounds to reasonably believe that Gallant was

intoxicated. Four witnesses, including Deputy Williams, noted that Gallant had balance

difficulties and mental functioning difficulties (e.g., confusion and difficulty responding to

questions).

> As to the crime of Reckless Driving, ORS § 811.140 provides:
>
> > (1) A person commits the offense of reckless driving if the person recklessly
> > drives a vehicle upon a highway or other premises described in this section
> > in a manner that endangers the safety of persons or property.
> >
> > (2) The use of the term "recklessly"[5] in this section is as defined in ORS
> > 161.085 . . . .

Defendants, in reliance upon these same facts, contend that probable cause existed to

arrest Gallant for Reckless Driving. Gallant's behavior included: entering the

northbound lane about five times; varying his speed between 45 mph to about 65 mph;

and driving off the pavement to the right, around a sign, and traveled east across both

lanes and off the pavement. Decl. of Peter Ness 2, ECF No. 30. Additionally, at the

time of accident, between 7:15 a.m. and 7:30 a.m., traffic on that section of Highway

99W was "usually very heavy." Decl. of Jerry Williams 3, ECF No. 24. Because this

behavior evidences probable cause to believe that Gallant drove in a manner that

---

circumstances. *See, e.g.*, *Draper v. United States*, 358 U.S. 307, 311–12 (1959) (rejecting defendant's argument that "hearsay" could not be considered in Court's probable cause analysis).

[5] ORS § 161.085(9) states:

> "Recklessly," when used with respect to a result or to a circumstance described by a statute
> defining an offense, means that a person is aware of and consciously disregards a
> substantial and unjustifiable risk that the result will occur or that the circumstance exists.
> The risk must be of such nature and degree that disregard thereof constitutes a gross
> deviation from the standard of care that a reasonable person would observe in the situation.

endangered the safety of persons or property, the only remaining issue is whether Gallant drove "recklessly."

Gallant contends that "one cannot 'consciously' fall asleep, period." Pl.'s Mem. in Opp'n to Summ. J. 14, ECF No. 39. In other words, because Gallant merely fell asleep, he did not "consciously disregard" any substantial and unjustifiable risk. This Court is not persuaded.

Even assuming[6] that Gallant did fall asleep, that does not preclude criminal liability. In *Newman*, for example, the Oregon Supreme Court discussed ORS § 161.095(1)[7] in the context of a DUII conviction and defendant's "sleep driving" defense. The Court, in holding that defendant was entitled to present evidence contesting the voluntariness of his conduct, also found:

> [I]f the state produces evidence [that defendant had "engaged in 'sleep driving' prior to this incident"], a jury could conclude that defendant's failure to take adequate precautions was an omission to perform an act defendant is capable of performing under ORS 161.095(1) and, if supported by evidence, that that failure to act led to the driving.

*Newman*, 353 Or. at 645 n.4. Moreover, the Court noted:

> [T]hat the formulation does not state that liability must be based on the voluntary act or the omission *simpliciter*, but rather upon conduct which

---

[6] Deputy Williams was not required to credit Gallant's "sleep" explanation under the circumstances. *See, e.g.*, *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003) ("Once probable cause to arrest someone is established, however, a law enforcement officer is not required by the Constitution to investigate independently every claim of innocence . . . ." (citation and internal quotation marks omitted)); *see also Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988) ("A policeman, however, is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause."); Decl. of Peter Ness 2, ECF No. 30 ("When Gallant was correcting his driving path, it was a smooth correction and not a jerking correction, as would be expected if someone had fallen asleep and just woken up with his car headed in the wrong direction.").

[7] ORS § 161.095(1) states:

> (1) The minimal requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform an act which the person is capable of performing.

> includes such action or omission. The distinction has some analytical importance. If the driver of an automobile loses consciousness with the result that he runs over a pedestrian, none of the movements or omissions that accompany or follow this loss of consciousness may in themselves give rise to liability. But a prior voluntary act, such as the act of driving, or a prior omission, such as failing to stop as he felt illness approaching, may, under given circumstances, be regarded as sufficiently negligent for liability to be imposed. In that event, however, liability is based on the entire course of conduct, including the specific conduct that results in in injury.

*Id*. at 644 (citation and internal quotation marks omitted) (emphasis in original). As in *Newman*, this Court's probable cause analysis is also concerned with Gallant's prior decision to drive and his possible prior failure to stop as he "bec[ame] aware that he [wa]s sleepy." *Id*. at 645.

Ambien, a sleep aid, has "been shown to impair coordination, reactive, and cognitive skills and reduce motor skills." Decl. of David C. Force 4, ECF No. 40. In fact, "[a] study in which subjects were dosed (10 mg) in the middle of the night demonstrated that individuals showed significant impairment when simulat[ing] driving, comparable to a blood-alcohol concentration (BAC) of .08 g/dL when the time interval was around 7 [hours] from dosing to driving." *Id*. "It has been shown that [Ambien] has an additive impairing effect on driving when used in combination with alcohol and other central nervous depressants." *Id*. Gallant informed Deputy Williams that he had "taken 12.5 mg"[8] of Ambien, in addition to other medications, the previous evening at around 6:00 p.m. *See* Decl. of Jerry Williams 4–5, ECF No. 24.

Gallant contends that, assuming his timeline is accurate, any prescription medication taken could not have impaired his driving because they were "completely

---

[8] Gallant contends that he took only 10 milligrams of Ambien. Decl. of James Gallant 3, ECF No. 42.

metabolized." Pl.'s Mem. in Opp'n to Summ. J. 15, ECF No. 39. However, Deputy

Williams was not required to adopt Gallant's prescription timeline or his post-arrest

assessment of Ambien's half-life. Rather, Deputy Williams, as a *prudent person*, was

entitled to rely upon the observations and statements available to him, to reasonably

conclude that Gallant was intoxicated and not merely sleepy. These observations, such

as Gallant's alleged impaired coordination, motor skills, and cognitive skills, are

consistent with the side effects of Ambien. *See* Decl. of David C. Force 4, ECF No.

40. Deputy Williams, aware that Gallant was a medical doctor, was also entitled to

consider Gallant's knowledge of the various side effects of the prescriptions he had

taken prior to driving. Collectively, these circumstances are sufficient to warrant a

prudent person to believe that Gallant was aware of and consciously disregarded the

substantial and unjustifiable risk that would result if he drove while remaining under

the influence of Ambien and other prescription drugs. *See State v. Smith*, 218 Or. App.

568, 272–73 (2008) (upholding conviction for reckless driving where defendant was

"extremely intoxicated" and had admitted to driving); *State v. Griffin*, 55 Or. App.

849, 853 (1982) (finding that "'[r]ecklessness' includes driving while under the

influence of intoxicants." (citations omitted)). Accordingly, because probable cause

existed, defendant Deputy Williams is GRANTED summary judgment.

## B. Plaintiff's *Monell* Claim

Gallant also alleges that Williams's unlawful conduct reflected the "policies and practices

of [defendant] Benton County." Pl.'s Am. Compl.3, ECF No. 4. Although this Court found

Gallant's arrest lawful, a brief assessment of his *Monell* claim[9] remains informative. *See also Orin v. Barclay*, 272 F.3d 1207, 1217 (9th Cir. 2001) ("A § 1983 action against a city fails as a matter of law unless a city employee's conduct violates one of the plaintiff's federal rights.").

"To impose liability on a local government for failure to adequately train its employees, the government's omission must amount to 'deliberate indifference' to a constitutional right." *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010). "This standard is met when 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

"To succeed, a § 1983 plaintiff must show that there is a direct link between the city policy and the constitutional violation." *Mackinney v. Nielsen*, 69 F.3d 1002, 1010 (9th Cir. 1995) (citing *City of Canton*, 489 U.S. at 385). "The plaintiff can show this link by proving that the policy itself is unconstitutional or that the city made a 'deliberate' or 'conscious' choice to fail to train its employees adequately." *Id.* (citations omitted). Gallant provides little if no evidence linking a Benton County policy with Deputy Williams's probable cause assessment and his subsequent arrest of Gallant. Statements made by Tara Bratsouleas and Loretta Robinson are not relevant to his Fourth Amendment claim as pled. Bratsouleas, a former paralegal at BCDA, focused her statement on the policies and practices at that office. Decl of Tara Bratsouleas 1–3,

---

[9] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

ECF No. 41.[10] That statement has no impact on Williams's decision, based on probable cause, to arrest Gallant. As to Robinson, a former Sergeant at Benton County Sheriff's Office (BCSO), her statement is also not relevant to the Fourth Amendment claim as plead. Robinson indicated that the post-arrest actions and statements of Sheriff Simpson and Scott Jackson evidenced "unusual vigor" in pursuing the prosecution of Gallant. Decl. of Loretta Robinson 1–4, ECF No. 43. Robinson's observations, like those of Bratsouleas, do not demonstrate a "link" between the alleged policy (i.e., animus toward and/or deterrence of medical marijuana usage) and the alleged unlawful seizure. Rather, construed in Gallant's favor, these statements only suggest that following Gallant's arrest, BCSO encouraged and remained interested in Gallant's continued prosecution. Thus, even had this Court found an asserted constitutional violation, these statements would have been insufficient to meet Gallant's burden at this stage in the proceeding. *See, e.g.*, *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) ("[E]vidence of the failure to train a single officer is insufficient to establish a municipality's deliberate policy."); *Boyd v. Benton Cnty.*, 374 F.3d 773, 784 (9th Cir. 2004) ("[Plaintiff] cannot survive summary judgment on her *Monell* claim by simply relying on the lack of a written policy."). Accordingly, defendant Benton County is GRANTED summary judgment on plaintiff's *Monell* claim.

## II. Plaintiff's Claim for Malicious Prosecution

Gallant, in his claim for malicious prosecution, asserts that Benton County, through Deputy Williams and others, "initiated and maintained a criminal prosecution" without probable cause and "from a motive of punishing and humiliating plaintiff and injuring his reputation and livelihood as a physician, because of his practice of prescribing" medical marijuana. Pl.'s Am.

---

[10] Bratsouleas stated that it was the policy of BCDA to "seek to discourage and deter use of the Oregon laws which legalized the use of marijuana for medical purposes." Decl of Tara Bratsouleas 2, ECF No. 41. Bratsouleas further noted that the District Attorney at that time, Haroldson, would meet with Sheriff Simpson on a weekly basis. *Id*.

Compl. 3–4, ECF No. 4. In response, defendants contend: (1) Benton County[11] did not institute a criminal complaint and (2) Deputy Williams had probable cause existed to arrest Gallant.

Because this Court previously found probable cause to arrest, *see supra* § I(A), Gallant's claim is precluded. *See Hartley v. State Water Res. Dept.*, 77 Or. App. 517, 520 (1986) ("To prevail on a claim for malicious prosecution, a plaintiff must prove that the defendant did not have probable cause to initiate the criminal proceeding." (citing *Lampos v. Bazar, Inc.*, 270 Or. 256, 266 (1974)). Accordingly, defendant Benton County is GRANTED summary judgment.

## CONCLUSION

For these reasons, defendants' motion for summary judgment, ECF No. 22, is GRANTED.


IT IS SO ORDERED.


DATED this 29th day of April, 2014.


_____ s/ Michael J. McShane _____
**Michael J. McShane**
**United States District Judge**

---

[11] Defendants contend that "prosecution attorneys in the Benton County District Attorney's Office are employees of the State of Oregon[,]" not Benton County. Defs.' Mem. in Supp. of Mot. Summ. J. 30, ECF No. 23.

17 – OPINION AND ORDER